UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-277-MOC-DCK

| | |
|---|---|
| FREDA J. DAY, )<br>)<br>         **Plaintiff,**  )<br>)<br>vs.                     )<br>)<br>OPRAH WINFREY, et al.,   )<br>)<br>)<br>)<br>         **Defendants.**  ) | **ORDER** |

**THIS MATTER** is before the Court on a Motion for Summary Judgment filed by Defendants Harpo Productions, Lionsgate Entertainment Corporation, Oprah Winfrey Network, LLL, and Oprah Winfrey. (Doc. No. 44). The Court held a hearing on the motion on December 16, 2020, and then again on February 17, 2021. The parties were allowed to file supplemental briefs following the December 16 hearing. This matter is ripe for disposition.

I.     BACKGROUND

**A. Plaintiff's Copyright Infringement Claim**

This is a copyright infringement action in which Plaintiff alleges that Defendants have infringed the copyright of Plaintiff's memoir, written in 1999, and hereinafter referred to as "the Book." (Compl., Doc. No. 1, ¶ 2). Plaintiff alleges that the Book is "based on [her] life experiences" and was "granted copyright protection" in April 2003 and was published in 2005. She also alleges that her publisher created a "CD disk" related to the Book. (Id. ¶ 4). Plaintiff does not allege that the CD was ever registered with the Copyright Office. Plaintiff alleges that she sent the Book by certified mail to "Defendant Winfrey" in 2009. (Compl., Doc. No. 1, ¶ 23).

Plaintiff alleges that Defendants were all involved in some capacity with the production or broadcast of Greenleaf, a television show that aired on Oprah Winfrey's network "OWN," which Plaintiff alleges infringes on the Book. (Id., ¶¶ 2, 9–12).

**B. Summary of the Book**

The Book, titled *From the Greenleaf to Greener Pastures: A Memoir*, is a lengthy memoir of Plaintiff's life, essentially an autobiography. Plaintiff was born around 1960. The Book was written in 1999 and describes Plaintiff's life up until that time. Plaintiff was one of ten children. Plaintiff's father operated a café called The Green Leaf. Plaintiff's father died when she was around four years old.

The Book describes Plaintiff's life as a child, living with her multiple siblings in a modest home maintained by her mother. The Book describes Plaintiff's adolescence, her early romances, and her college experiences. The vast majority of the Book deals with Plaintiff's relationship with a man named Ed, whom she eventually marries. Ed is an alcoholic and habitual drug user, is usually unemployed, and is physically and mentally abusive to Plaintiff. The Book describes how Plaintiff and Ed lived in poverty (often getting by on food stamps and without electricity) and how Plaintiff and Ed were evicted more than a dozen times from various apartments. Plaintiff describes a series of low paying and unfulfilling clerical jobs she had with various governmental agencies, schools, and hospitals, from which she was either fired or quit. Plaintiff describes how she and Ed had frequent run-ins with the law and how they were arrested and jailed from time to time on minor charges. Plaintiff describes raising three children she had with Ed. Throughout the Book, Plaintiff discusses her strong faith in God and was generally optimistic that her life would get better. Plaintiff states on several occasions that she rarely attended church. Her faith in God was personal, not institutional. At the end of the Book, in

1999, when she was around thirty-nine years old, Plaintiff describes how she applied for and obtained a teaching job in North Carolina. The Book ends at that point, with Plaintiff stating how she believed she would be moving on to a better life.

The Book is structured chronologically. The first chapter addresses the story of Plaintiff's mother, how she met Plaintiff's father (who was married to another woman), and the ten children they had together. The Book thereafter chronicles Plaintiff's life from childhood through adulthood sequentially as it occurred. Along the way, the Book presents hundreds of short anecdotes and stories about Plaintiff and Ed, their extended family members, and their friends.

**C. Summary of the Television Series Titled "Greenleaf"**

Greenleaf is a fictional television series set in the present. It is the story of a large, affluent African-American church in Memphis, Tennessee, its leader Bishop Greenleaf (a man in his 60s), and his family. Bishop Greenleaf and his wife Mae have been married for 44 years, and they have four children. At the beginning of the show, it is revealed that one of them, Faith, has committed suicide. The other three children are:

1. Grace – a woman in her 40's who left the church and her family 20 years earlier to pursue a career as a television journalist. She has a teenage daughter and is a single mother. She is the main character and protagonist of Greenleaf.

2. Jacob – a man in his mid-30s who works in the church as an assistant pastor to his father. He is married and has two children, one of whom is a teenager who becomes friends with Grace's daughter.

3. Charity – a woman in her late 20's or early 30's who is in the church choir, is married and wants to have children.

3

Greenleaf begins with Grace and her daughter returning to Memphis from their home in Phoenix to attend Faith's funeral. Grace agrees to stay in Memphis after the funeral, ostensibly to work in the church, but her real reason for staying is to try to prove that her uncle (Mae's brother) is molesting young girls. Indeed, Grace's uncle molested Faith as a young girl, and this ultimately led to her suicide. This is the primary storyline of the first season of Greenleaf, but there are multiple subplots as well.

In the first season the following subplots are featured:

a. Grace, who is a talented preacher in her own right, becomes more and more involved in church affairs and starts counselling parishioners and leading services on her own. (Episodes 102, 105, 106 and 113).

b. Jacob and his wife have marital difficulties because he was having an affair; eventually they go to counseling and reconcile. (Episodes 101–106).

c. Jacob is put on leave by Bishop Greenleaf, which alienates him and causes him to join a rival church. (Episodes 105 and 111–13).

d. Charity's husband, Kevin, becomes attracted to a man who helps run a homeless shelter at the church; Charity begins to suspect that her husband might be gay. (Episodes 102, 103, 105, 106 and 109–13).

e. A police officer and church member accidentally shoots an innocent teenager, becomes ostracized by the church (the Bishop ignores him fearing congregation backlash), and is eventually killed in the church parking lot. (Episodes 102, 104 and 108).

The show explores the relationships and career aspirations of all of the Greenleaf family members, as well as contemporary social issues such as the Black Lives Matter movement, sexual abuse, and the role of formal religion in the contemporary African-American community.

Significantly, and in stark contrast to the Book, the fictional Greenleaf family does not live in poverty. Rather, they live a life of luxury and privilege, residing in a mansion and working at a sleek, modern, contemporary church complex. Nor is Greenleaf a biography. It does not trace the steps of anyone's 40-year journey to adulthood. Its characters come to the first episode of the show fully formed and developed.

The following facts are undisputed on summary judgment:

1. The only submission to any of the Defendants that Plaintiff can recall is a purported submission by certified mail to Defendant Winfrey in 2009. (Shephard Decl., Ex. A, Response to Interrogatory No. 1).

2. Even though Plaintiff claims to have submitted the Book to Defendant Winfrey in 2009 by certified mail, Plaintiff has no receipt or other evidence to confirm that fact. (Shephard Decl., ¶ 7); (Shephard Decl., Ex. C, Request No. 10).

3. Plaintiff has no recollection of whether her alleged submission of the Book was accompanied by a transmittal letter. (Shephard Decl., Ex. A, Response to Interrogatory No. 4). No transmittal letter has been produced. (Shephard Decl., ¶ 7).

4. The address to which Plaintiff claims to have sent the Book to Defendant Winfrey was not used by Defendants in 2009 when the Book was allegedly sent. (Nordman Decl., ¶ 4). The address was not used by Defendants until 2015. (Id.).

5. There is no record of the Book in submission logs maintained by Ms. Winfrey's companies where submitted material, if reviewed and considered, is recorded. (Nordman Decl., ¶ 6); (Declaration of Cindy Iwaki ("Iwaki Decl."), ¶ 4).

5

6. The person who actually created Greenleaf, Craig Wright,[1] came up with the name Greenleaf. (Declaration of Craig Wright ("Wright Decl."), ¶ 4–6). In part, the name was a reference to a short story of the same name written by Flannery O'Connor in or about 1965. (Id.).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must

---

[1] Mr. Wright is named as a defendant in this action but has never been served. Mr. Wright attests in his sworn Declaration that, before the filing of this lawsuit, never saw, read, or even heard of the Book. (Wright Decl., ¶ 5).

present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. COPYRIGHT INFRINGEMENT—GENERAL ELEMENTS

To prevail in a copyright infringement action, a plaintiff must establish (i) ownership of a copyright in a work and (ii) copying by defendant of original elements of the work. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Because proof of actual copying is difficult to establish, a plaintiff may prove copying by establishing that (i) the defendant had access to plaintiff's copyrighted work and (ii) the works at issue are substantially similar. Towler v. Sayles, 76 F.3d 579, 582 (4th Cir. 1996). Both access and substantial similarity are required to prevail in a copyright claim. Id. at 583. If either is lacking, the claim will fail.

Defendants first contend that they are entitled to summary judgment because Plaintiff has not raised a genuine issue of disputed fact as to whether any of the Defendants had access to the Book. The Court agrees. To prevail on a claim of copyright infringement, "a plaintiff must show that a defendant had a reasonable opportunity to view or copy the work at issue." Moore v. Lightstorm Entm't, 992 F. Supp. 2d 543, 550 (D. Md.), aff'd, 586 F. App'x 143 (4th Cir. 2014).

7

"To prove access, the plaintiff must show that the defendant had an opportunity to view or copy the work. The 'mere possibility' of such an opportunity is not enough. It must be 'reasonably possible' that the defendant had access to the copyrighted work." Bldg. Graphics, Inc. v. Lennar Corp., 708 F.3d 573, 577 (4th Cir. 2013) (citations omitted). A plaintiff may not establish access to her work through mere speculation and conjecture. Moore, 992 F. Supp. 2d at 550; see also Bldg. Graphics, Inc., 708 F.3d at 580 (granting summary judgment in favor of defendant where evidence of access was derived from "inferences built upon inferences"); Eaton v. Nat'l Broad. Co., 972 F. Supp. 1019, 1025 (E.D. Va. 1997) ("[H]ypothetical possibilities [that someone may have forwarded a script to a senior executive] are mere conjectures insufficient to create a genuine issue of material fact.").

### i. ACCESS

Here, Plaintiff has simply not raised a genuine issue of disputed fact as to whether Defendants obtained access to the Book. First, Plaintiff alleges that she "submitted a copy of the book by certified mail to 'Defendant Winfrey' in 2009." (Doc. No. 1, ¶ 23). In discovery, Defendants served interrogatories asking if this was the only submission to Defendants. Plaintiff responded that she "can't recall" any others. (Shephard Decl., ¶ 3–4; Shephard Decl., Ex. A, Response to Interrogatory No. 1). Defendants also served interrogatories asking what address was used for the alleged 2009 submission to Defendant Winfrey. (Shephard Decl., ¶ 5). Plaintiff responded that "it was the same address used in the summons in which a copy of my complaint was mailed." (Shephard Decl., Ex. A, Response to Interrogatory No. 3). The summons to defendant Winfrey was mailed to 1041 Formosa Ave., Hollywood, California, which is the corporate address of defendant OWN, LLC (of which Defendant Winfrey is an officer). (Shephard Decl., ¶ 6; Shephard Decl., Ex. B). OWN, LLC, however, did not begin working

from that office until 2015. (Nordman Decl., ¶ 4). Thus, Plaintiff's verified statements in discovery that she sent her book to Defendant Winfrey in 2009 at the 1041 Formosa Avenue address cannot establish access because it is undisputed that OWN was not yet even doing business at that address at the time of the alleged submission.[2]

Significantly, while Plaintiff alleged in the Complaint that the Book was sent to Defendant Winfrey by certified mail, in response to interrogatories asking about the whether she had a receipt evidencing the alleged certified mailing, Plaintiff stated that "I'm not sure of its location." (Shephard Decl., Ex. A, Response to Interrogatory No. 6). No certified mail receipt was produced in response to Defendants' request for production of documents which requested it. (Shephard Decl., ¶ 7; Shephard Decl., Ex. C, Request No. 10).

Second, Defendants have produced evidence on summary judgment showing that, even if there were evidence of a transmittal of the Book addressed to Defendant Winfrey at OWN, the Book would never have made its way to Defendant Winfrey because of OWN's long-standing policy that unsolicited submissions of material are never forwarded to Ms. Winfrey or anyone else. Instead, they are returned to the sender by OWN's legal department. (Nordman Decl., ¶ 5). Another entity affiliated with Ms. Winfrey, Harpo Productions, has the same policy. (Iwaki Decl., ¶ 3).

Third, Defendants have produced evidence showing that, when there are submissions of material from authorized sources that OWN considers for possible use, those submissions are entered and noted in a submission log. (Nordman Decl., ¶ 6). OWN's submission log has no

---

[2] In contravention of what she said in her interrogatory responses, Plaintiff alleged in her Complaint that she sent the Book to "Oprah Winfrey Studios located in Chicago, IL." (Compl., Doc. No. 1, ¶ 3). There is no entity named Oprah Winfrey Studios. Defendant Harpo Productions, Inc., one of Ms. Winfrey's companies, is in Chicago.

entry for or reference to the Book or any other submission by Plaintiff. (Id.). Harpo Productions has the same procedure, and its submission log has no entry for or reference to Plaintiff or her Book. (Iwaki Decl., ¶ 4).

Fourth, as Defendants note, in any event, Defendant Winfrey did not create the show Greenleaf. Craig Wright, who was named as a defendant in this action but who has never been served, was the creator of Greenleaf. (Wright Decl., ¶ 4). Mr. Wright has submitted his own sworn affidavit, attesting that before the filing of this litigation, he had never seen, read, or heard of the Book, nor did he ever discuss Plaintiff's Book with Ms. Winfrey or anyone else. (Id., ¶ 5).

In sum, Plaintiff has produced no evidence on summary judgment raising a genuine dispute of fact as whether any of the named Defendants had access to the Book before the alleged copyright; thus, her copyright infringement claim fails on this ground alone.

### ii. SUBSTANTIAL SIMILARITY

#### a. Extrinsic Test

The Court further finds that, even if Plaintiff could raise a genuine factual dispute as to whether Defendants had access to the Book, Defendants are entitled to summary judgment because the works at issue are simply not substantially similar. In determining whether two works are substantially similar in protected expression, a plaintiff must satisfy both an "extrinsic" (or "objective") test and an "intrinsic" (or "subjective") test. Dawson v. Hinshaw Music Inc., 905 F.2d 731, 733 (4th Cir. 1990) (citing Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir. 1984); see also Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 801 (4th Cir. 2001). The extrinsic test examines the specific objective elements of the works at issue. To satisfy the extrinsic test, the works at issue must be similar in plot, theme, dialogue, mood, setting, pace, characters, and sequence of events. Towler, 76 F.3d at 584. However, only

10

copyrightable elements of the plaintiff's work can be infringed. Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 436 (4th Cir. 2010) (per curiam).

Before comparing the works, courts must "'isolate the protectable expression' in the copyrighted work in order to determine whether there are substantial similarities between that protected expression and the defendant's work." Comins v. Discovery Commc'ns, Inc., 200 F. Supp. 2d 512, 518 (D. Md. 2002) (quoting Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 47 (D.C. Cir. 1999)). Where a plaintiff fails to satisfy the extrinsic test, a claim for copyright infringement should be dismissed as a matter of law. Copeland v. Bieber, 789 F.3d 484, 490 n.1 (4th Cir. 2015) ("[A] district court may grant a motion to dismiss or summary judgment under the extrinsic prong alone."); see also Tessler, 2008 WL 5781733, at *4. Here, applying the extrinsic test, the Court finds as a matter of law that none of the constituent elements of the Book–its plot, theme, dialogue, mood, setting, pace, characters, and sequence of events–bear any similarity (let alone substantial similarity) to Greenleaf. The Court will discuss each element in order.

**Plot**. First, as to plot, because the Book is a memoir, it does not really have a plot. It is merely Plaintiff's presentation of her life story: a child is raised by a single parent, lives a life of poverty, marries an unemployed alcoholic, is abused both emotionally and physically by her husband, raises three children while being serially evicted from more than a dozen residences, has numerous run-ins with the law, has a series of unfulfilling jobs from which she is fired or quits, and eventually moves to North Carolina in 1999, where she hopes to begin a better life. None of this happens in the Greenleaf television series.

In contrast with the Book, the Greenleaf television series is a fictional piece about a present day African-American church, its bishop, and his family. The first season primarily

11

focuses on the quest of its main character (daughter Grace Greenleaf) to stop a serial child molester. Beyond that, the drama focuses on the church's internal affairs, the bishop's relationship with his congregation, and each child's participation in preaching and managing the church. The Book has none of those elements as part of its plot. That is, here is no church at the center of the Book's story, there is no bishop, there is no family of adult children vying for influence within a church, and there is no pursuit of a serial child molester, which is the central plot of the first season of Greenleaf.

Given these stark differences, there is simply no substantial similarity as to plot. In her complaint, Plaintiff contends that the Book is about "scandalous relationships, abortion, debilitating poverty, and [Plaintiff's] tumultuous marriage," and how "through it all, she [Plaintiff] finds the faith to pursue her dreams by turning to God." (Compl., ¶ 20). First, that is not a plot description and it is not protectible. Scandalous relationships, a tumultuous marriage, abortion, and faith in God are "general ideas" or broad "themes" and are simply "not eligible for copyright protection." Moore, 992 F. Supp. 2d at 555. Second, what Plaintiff describes is not at all the plot of Greenleaf. For example, the claimed prevailing "plot" of Plaintiff's work–that is, people living in and surviving debilitating poverty–is completely absent from Greenleaf. The Greenleaf family is portrayed as extremely wealthy and live a life of luxury and privilege. The show never suggests (much less depicts) any of them overcoming poverty or economic hardship of any kind.

**Characters**. Next, the Book's characters are not substantially similar to Greenleaf's characters. The primary "characters" in the Book are Plaintiff (raised by a single mother, marries an abusive man, lives a life of poverty, and ultimately overcomes it), Ed (Plaintiff's alcoholic, drug addicted, abusive, unemployed husband) and Plaintiff's mother (who raised ten

children by herself despite limited financial means of her own). There are no corresponding characters in Greenleaf. Greenleaf's primary characters are Grace (estranged from her family for years, but returns home after her sister commits suicide, seeks to get her uncle arrested for being a child molester, and becomes a pastor at her father's church) and Bishop Greenleaf (a man in his late 60's who leads a contemporary African-American congregation).

In her complaint, Plaintiff alleges that several characters in Greenleaf are in part based on Plaintiff herself: "The main character Freda [Plaintiff], life changes has been transformed onto those represented by all of the sisters in the Greenleaf TV show [sic]." (Compl., ¶ 21). In describing these supposed similarities, Plaintiff alleges that Charity Greenleaf (the Bishop's youngest daughter) shares Plaintiff and Ed's "marital problems in their twenties," that Grace Greenleaf is "an aspiring journalist" similar to Plaintiff, and that Plaintiff and Ed's "marital woes in their thirties" are similar to those of Kerrise, the wife of Jacob Greenleaf. (Compl., ¶ 22). These alleged similarities simply cannot establish copyright infringement.

First, "[i]t is well-established that '[c]opyright law provides very limited protection to characters presented in a creative work. Basic character types are not copyrightable.'" Eaton, 972 F. Supp. at 1027-28 (quoting Jones v. CBS, Inc., 733 F. Supp. 748, 753 (S.D.N.Y. 1990) (finding it insufficient to establish infringement where the plaintiff's work contained a "conjure lady" and the defendant's work contained "Sister Sadie, a voodoo practitioner")). In other words, two characters sharing the supposed "trait" of having had "marital problems" is not sufficiently unique or novel to establish similarity for purposes of copyright analysis. See Levi v. Twentieth Century Fox Film Corp., No. 3:16CV129, 2018 WL 1542239, at *7 (E.D. Va. Mar. 29, 2018) (finding that characters that share "basic character traits" but that are not "uniquely developed" and "novel" in their portrayal are not substantially similar).

Second, even if these were actionable similarities, it is improper to "pick[] and choose[] traits of different people instead of comparing parallel characters." Moore, 992 F. Supp. 2d at 557; see also Eaton, 972 F. Supp. at 1028 (improper to contrast two ostensibly similar characters where one was "the main character" of one work and the other was simply a "secondary character" in the other). For these reasons, Plaintiff has simply not shown that the characters in the two works are substantially similar.

**Theme**. Next, the Book's theme appears to be that people can overcome major adversity in their lives if they persevere and have faith in God. Greenleaf contains no such theme. Rather, the themes in Greenleaf appear to be that "crime does not pay" and the exploration of contemporary issues in the African-American religious and social experience (such as the Black Lives Matter storyline of season one). That the Book occasionally refers to Plaintiff's faith in God and Greenleaf involves a church does not make them substantially similar.

Moreover, Plaintiff's faith as reflected in the Book is deeply personal and is not practiced in a formal church setting as in Greenleaf, nor is the Book about a large affluent family-run church or the moral and ethical struggles of its Bishop and his adult children. As repeatedly stated in the Book, Plaintiff rarely attended church. For example, she states in the book, "I didn't even attend church regularly," (Book, p. 228); "My interaction with God came about regardless of the fact that Momma never took all of us to church as a family," (Id., p. 245); "At that time in my life, I didn't even have a church home, though I'd experienced firsthand the power of prayer," (Book at p. 307); and "[despite] the few times we did attend church, I assured her that the only thing left for solace was to continuously keep praying," (Id., p. 331). Additionally, the concept of faith is not protectible by copyright, and that the two works each address faith in

14

totally different ways does not make them substantially similar. Eaton, 972 F. Supp. at 1027 ("general ideas, themes, or plots are not eligible for copyright protection").

**Mood and Setting**. The mood of the Book is bleak: abject poverty, abusive relationships, lost jobs, arrests, evictions, and having to move almost every year. The Book takes the reader starkly into the terribly challenging life Plaintiff endured until she was almost forty years old. Virtually every scene in the Book occurs someplace where Plaintiff and her family are living near or below the poverty line. The mood of Greenleaf, by contrast, is of intrigue and mystery, revealing power struggles within the powerful and wealthy Greenleaf family, and the quest to bring a serial molester to justice. Moreover, unlike the poverty which permeated Plaintiff's life and is portrayed in the Book, the primary characters in Greenleaf lead a life of luxury, wealth, and privilege. Most of the action in Greenleaf takes place in the lavish Greenleaf family mansion and the modern sleek church complex where the Greenleaf family members work, not the impoverished neighborhoods where the Book takes place. Thus, the mood and setting are not substantially similar.

**Pace and Sequence**. Next, the Book covers the first 40 years of Plaintiff's life. In fact, it begins with a lengthy story of the life of Plaintiff's mother before Plaintiff was even born. The primary action covered by the Book starts in 1960 and ends in 1999. By contrast, Greenleaf does not cover decades of time. The events portrayed take place in a matter of months. Nor is it set in the past. Greenleaf is set in the present and its fictional storyline addresses contemporary social and legal issues. Thus, the pace and sequence of the two works are not substantially similar.

**Dialogue**. For dialogue to be deemed substantially similar, there must be "extended similarity" throughout the two works. Moore, 992 F. Supp. 2d at 557–58 (quoting Olson v. Nat'l Broad. Co., Inc., 855 F.2d 1446, 1450 (9th Cir. 1988)). There is no such similarity here.

15

Plaintiff has not cited any protectable dialogue that she wrote in the Book that appears in Greenleaf. In her Complaint, Plaintiff points to instances where portions of scripture are referenced in both works, including such common place occurrences as the recitation of Psalm 23 ("The Lord is my Shepherd") at a funeral. (Complaint, pg. 8–9 of 23, Episode 1, Section III Comparison). Plaintiff cannot claim copyright over one of the most well-known and often-quoted Biblical verses. A list of common idioms and quotations from other sources is not evidence of substantial similarity. See Staggs v. West, PJM 08-728, 2009 WL 2579665, at *3 (D. Md. Aug. 17, 2009) ("However, each of these allegedly identical phrases contain common words or phrases–such as 'good life'–that simply are not copyrightable.") (quoting Darden v. Peters, 488 F.3d 277, 286 (4th Cir. 2007)).

The fact that part of the title of the Book includes the words "The Green Leaf" is not actionable either. Titles are not protected by copyright. Comins, 200 F. Supp. 2d at 518); Hayes v. Rule, No. 1:03cv1196, 2005 WL 2136946, at *8 (W.D.N.C. Aug. 19, 2005) (finding no actionable similarity between two CDs named "Blood in My Eyes" and "Blood in My Eye"). Moreover, the "Green Leaf" in the title of the Book (two words) refers to the name of the café owned by Plaintiff's father. By contrast, the word Greenleaf (one word) as the title of Defendants' television series is a family surname. Moreover, the Greenleaf name chosen by Craig Wright for the title of the television series was based, in part, on the 1965 short story "Greenleaf," written by Flannery O'Connor. (Wright Decl., ¶ 6).

In sum, the Book and Greenleaf have profound differences in plot, theme, dialogue, mood, setting, pace, characters, and sequence of events. To avoid summary judgment, Plaintiff must show that each of the elements described above which form the basis of the extrinsic test and show that specific protectable expression (not general broad themes or experiences that are

16

common to the human condition) that she created in the Book are also found in Greenleaf. She has simply not done this. Instead, Plaintiff seems to take elements from each of the 13 episodes of Greenleaf's first season and purports to find similarities that appear somewhere in the Book. (Compl., pp. 6–22 of 23). Plaintiff purports to find similarity in matters that are trivial, not protectible, and/or inherent to the human condition. For example, she finds similarities between the Book and Greenleaf because: in each work someone has a great aunt; in each work someone had an affair; each has gay characters; both the Book and Greenleaf use the term "mere mortals"; in each work certain people and characters get marital counseling, etc.

It is well settled in this Circuit and elsewhere, however, that a claim for copyright infringement cannot be based on "random similarities scattered throughout the works." Towler, 76 F.3d at 584 (citing Litchfield, 736 F.2d at 1356). Such purported similarities are "inherently subjective and unreliable." Id. Thus, a plaintiff's subjective, generalized and self-serving statements of purported similarity, such as those alleged in the Complaint, are irrelevant, no matter how numerous. See, e.g., Moore, 992 F. Supp. 2d at 558–59 (granting summary judgment in defendant's favor even though plaintiff "can cite to over one hundred (100) substantial similarities and at least seven (7) fragmented literal similarities," throughout the works because "lists of random similarities are insufficient"); Eaton, 972 F. Supp. at 1026–27 (same, where plaintiff offered "a 17–page chart that points to numerous purported similarities," because such similarities were "superficial, haphazard, and at most skeletal resemblances").

In sum, the Court finds as a matter of law that fundamental differences between the works preclude a finding of substantial similarity based on the extrinsic test.

**b. Intrinsic Test**

17

Case 3:19-cv-00277-MOC-DCK   Document 56   Filed 05/12/21   Page 17 of 19

Because the Court finds as a matter of law that Plaintiff cannot satisfy the extrinsic test, summary judgment is appropriate on that basis alone. Nevertheless, the Court has also applied the intrinsic test for substantial similarity, and the Court finds that the works are not substantially similar under the intrinsic test either. The relevant inquiry for the intrinsic test is whether the "total concept and feel" of the works at issue are the same when viewed from the perspective of an ordinary observer. Towler, 76 F.3d at 584 (finding two works "intrinsically dissimilar" where they had a different "total concept and feel"). Like the extrinsic test, the intrinsic test can be determined by the Court as a matter of law in a motion for summary judgment. Moore, 992 F. Supp. 2d at 558.

To apply the intrinsic test, the Court generally asks whether an ordinary observer conclude that the overall concept and feel of the two works are the same. See Dawson v. Hinshaw Music, Inc., 905 F.2d 731, 736 (4th Cir. 1990). The Court concludes that the answer to this question is no. The Book is an autobiography, spanning 40 years, from 1960 to 1999, of a woman living and then overcoming a life of hardship and abuse. Greenleaf, by contrast, is a contemporary drama about an African-American church, its Bishop, and his adult children, who live a life of luxury and wealth, and the quest of the main character to prove that her uncle is a serial child molester. Not only is the "total concept and feel" of the Book and Greenleaf completely different, but there is not even superficial similarity between the two works.

## IV.  CONCLUSION

For the reasons stated herein, the Court finds, as a matter of law, that Plaintiff has not raised a genuine disputed issue of fact as to whether Defendants have infringed Plaintiff's copyright in her work, the Book. For the reasons stated herein, the Court grants summary judgment to Defendants.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Motion for Summary Judgment filed by Defendants, (Doc. No. 44), is **GRANTED**, and this action is dismissed with prejudice.

Signed: May 11, 2021

Max O. Cogburn Jr
United States District Judge